## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 07-_____ |
| | : |
| ONE 2005 LAMBORGHINI MURCIELAGO | : |
| VIN ZHWBU26S45LA01590, ONE 2006 | : |
| PORSCHE CAYMAN S | : $-07-498^-$ |
| VIN WPOAB298X6U783591, ONE 2006 | : |
| 2006 LINCOLN MARK LT | : |
| VIN 5LTPW18516FJ00632 and NINETY FIVE | : |
| THOUSAND SIX HUNDRED DOLLARS IN | : |
| UNITED STATES CURRENCY, | : |
| | : |
| Defendants *in rem*. | : |

## **VERIFIED COMPLAINT *IN REM***

Plaintiff, United States of America, by and through Colm F. Connolly, United

States Attorney for the District of Delaware, and Douglas E. McCann, Assistant United States

Attorney for the District of Delaware, in accordance with Supplemental Rule G(2) of the Federal

Rules of Civil Procedure, brings this complaint and alleges as follows:

## **NATURE OF THE ACTION**

1. This is an action to forfeit and condemn to the use and benefit of the United States of

America one 2005 Lamborghini MurcielagoVIN ZHWBU26S45LA01590 (the

"Lamborghini"), one 2006 Porsche Cayman S VIN WPOAB298X6U783591 (the

"Porsche"), one 2006 Lincoln Mark LT VIN 5LTPW18516FJ00632 (the "Lincoln") and

Ninety Five Thousand Six Hundred Dollars in United States Currency (the "Currency")

(collectively, the "defendants *in rem*") for violations of 18 U.S.C. §§ 371, 981(a)(1)(A),

981(a)(1)(C), 1343, 1957 and 28 U.S.C. § 2461(c). The defendants in rem were seized by

the State of Delaware on or about February 10, 2007, in Newark, Delaware. The defendants *in rem* were taken into federal custody pursuant to a seizure warrant on or about April 17, 2007.

## JURISDICTION AND VENUE

2.    Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants *in rem* under 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 28 U.S.C. § 2461(c). This Court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355.

3.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because acts or omissions giving rise to the forfeiture occurred in this District, and because the defendants *in rem* are located in this District.

## FACTS

**Case Overview**

4.    On February 8, 2007, police in Texas conducted a car stop during which the driver was found to be transporting over $155,000 in cash to a person in Delaware.

5.    The driver admitted that the money was "dirty" and that he was transporting the cash to Pawel "Paul" Dynkowski (referred to herein as "Dynkowski") in Delaware.

6.    In early February, 2007, Dynkowski was 21 years old. At all relevant times, Dynkowski lived in Newark, Delaware.

7.    The driver cooperated by participating in a monitored, controlled delivery of the money to Dynkowski at his residence in Delaware on February 10, 2007.

8.    Documents found during a subsequent search of Dynkowski's residence and further investigation revealed that, at least since 2005, Dynkowski has been engaging in

2

fraudulent stock trading practices that have netted him substantial illegal profits. As detailed below, some of those illegal profits, or property purchased with those profits, included the defendants *in rem*.

**The Texas Cash Seizure**

9.   On February 8, 2007, an officer with the Texas Department of Public Safety conducted a car stop and seized currency totaling $155,300. Of that amount, about $146,000 was found in a DHL bag, and about $8,600, was found in a shoe packed in luggage.

10.  The driver and sole occupant of the rental car was David Justin Woods, a 25 year old resident of Florida.

11.  In early February 2007, Woods was asked by Matt Brown, a high school friend who resides in Aliso Viejo, California, to do a driving job for $10,000.

12.  Specifically, Brown asked Woods to deliver cash from California to Pawel Dynkowski in Delaware.

13.  Woods agreed, and Brown paid for Woods to fly from Florida to California.

14.  Once he arrived in California, Woods rented a car and drove to Brown's home where Brown retrieved the DHL bag containing the currency and gave it to Woods.

15.  Although Woods got the money from Brown, the currency actually came from Joseph "Joey" Mangiapane, Jr., a 41 year old associate of Brown's.

16.  Woods described the money as "dirty", but did not know what criminal activity had generated the money.

17.  The $10,000 Woods was paid came from Dynkowski's portion of the illegal proceeds.

18.  Woods met Dynkowski during a trip to Las Vegas in 2006 that he (Woods) and some

3

others had taken with Matt Brown.

**The Seized Cash is Delivered to Dynkowski**

19.    On February 10, 2007, Woods made a controlled delivery of the currency to Dynkowski's
       residence in Newark, Delaware.

20.    Dynkowski greeting Woods by saying, "....you got my FedEx package?"

21.    Woods entered the residence and gave the currency to Dynkowski.

**The Search of Dynkowski's Residence**

22.    Pursuant to a warrant, on February 10, 2007, State authorities executed a search of
       Dynkowski's residence in Newark, Delaware.

23.    Dynkowski lives with his parents, Ryszard "Richard" Dynkowski (referred to herein as
       "Richard") and Elzbieta "Elizabeth" Dynkowski (referred to herein as "Elizabeth").

24.    As a result of the search, authorities retrieved the currency Woods had delivered, an
       additional $108,900 in cash, and many financial documents and other documents related
       to stock trading by Dynkowski under both his own name and the name Tetrix Financial,
       Inc. ("Tetrix Financial").

25.    Tetrix Financial is a consulting business owned by Dynkowski.

26.    Of the $108,900 in additional cash found, the Currency ($95,600) was found in a metal
       lunch box under Dynkowski's bed. The denominations of the Currency was as follows:
       $93,600 in one hundred dollar bills and $2,000 in fifty dollar bills.

27.    The remaining $13,300 was found in a bureau in Dynkowski's parents' bedroom.

28.    At the time of the search, State authorities observed the Lamborghini, the Porsche and the
       Lincoln at Dynkowski's residence.

4

**Quartarolo's Statement**

29. At all relevant times, Ashley Quartarolo was Dynkowski's girlfriend.

30. Quartarolo was present during the search and gave a statement to authorities.

31. Regarding the cars, Quartarolo stated that the Lamborghini was Dynkowski's car, but that it was registered in Richard's name and was paid off.

32. Quartarolo explained that Dynkowski had "Gerard", a resident of Florida, buy the Lamborghini for Dynkowski to repay Dynkowski for "something" Dynkowski did for Gerard. Thus, the Lamborghini was a payment from "Gerard" to Paul.

33. Quartarolo stated that the Lamborghini cost "like three-ten" [$310,000]. Quartarolo further stated that the Porsche was Dynkowski's, but that he still owed money on it. Dynkowski had asked her if he should just pay off the loan on the Porsche. Quartarolo said that the Lincoln also was Dynkowski's car, but that Richard's father had provided $10,000 towards its purchase.

**Dynkowski's Statement**

34. Subsequent to the execution of the search warrant, Pawel Dynkowski gave a statement to authorities.

35. During the interview, Dynkowski claimed that his income was derived from investment banking transactions.

36. Dynkowski explained that the currency delivered to him was his commission for raising capital for a new company. The transaction was with Matt Brown and a company named "Global something."

37. Dynkowski said that Matt Brown ran an investment banking firm in California.

5

38. Dynkowski stated that he did not know much about Matt Brown and that he had never met Woods prior to Woods' delivery of the currency.

39. Dynkowski concealed the fact that he knew Woods from a prior trip to Las Vegas.

40. Dynkowski stated that the currency in his bedroom was from ATM withdrawals he had made over the last six months from his bank accounts at Wachovia and Commerce Bank, and that he had made the cash withdrawals so that he had cash to use for Atlantic City casino trips.

41. The bulk of the Currency was in $100 denominations; however ATM machines do not dispense $100 bills.

42. Dynkowski further explained that he does not like to keep a lot of money in banks; however, a review of Dynkowski's bank records showed that in August 2006, Dynkowski had over $100,000 in his personal bank account at Commerce Bank.

43. Dynkowski stated that the Lamborghini belonged to him and that the Porsche and the Lincoln belonged to Richard.

44. Dynkowski said that the funds used to pay for the Lamborghini came from stock trading.

45. Dynkowski further stated that Richard was employed as a maintenance person and also had a home remodeling business.

46. Dynkowski states that Elizabeth was not working due to being disabled.

47. Dynkowski said that his parents had nothing to do with his investment banking business.

**Dynkowski was Involved in Penny Stocks**

48. A review of the records found during the search of Dynkowski's home showed that Dynkowski, operating under both his own name and as Tetrix Financial, was heavily

involved in the trading of penny stocks.

**Penny Stocks are Susceptible to Illegal Manipulation**

49. The Securities and Exchange Commission ("SEC") describes a penny stock in this way:

> The term 'penny stock' generally refers to low-priced (below $5) speculative
> securities of very small companies.  All penny stocks trade in the OTC Bulletin
> Board or the Pink Sheets – but not on national exchanges, such as the New York
> Stock Exchange or the Nasdaq Stock Market.

50. However, many market participants believe that to be a true penny stock, in addition to

having low priced shares, the company's market cap should be $100 million or less.

51. Only a few thousand shares of penny stocks trade on an average day.  Even in the rare

instance where a penny stock sees trades numbering in the millions, the dollar amount

traded is still quite low because the price of each share is so low.   Thus, relatively small

investments in these stocks can artificially raise or lower the stock price.

52. In addition, analysts and the media generally do not report on penny stocks.  Furthermore,

many penny stocks are not required to file financial reports with the SEC, which means

that financial data on a company is not readily available to the public.

53. For these reasons, e.g., the low price, the low volume of shares sold, and the dearth of

solid information, penny stocks are more susceptible to manipulation, and, therefore,

penny stocks are fertile ground for fraud.

54. One such fraud is the "pump and dump" - an illegal activity in which a person or a group

of people obtains a block or blocks of stock and then pumps up the price of the stock by

fraudulently attracting interest in the stock by trading and/or marketing activity.  Once the

price of the stock has risen sufficiently, the fraudsters dump their shares.

55.     One way of fraudulently attracting interest in a stock is by buying shares of a stock

        through at least two different brokers or under different names. This increased activity

        creates the impression that independent and aggressive investors are operating in the

        market perhaps because "big news" is about to come out about the stock. Thus, this

        practice involves the illegal manipulation of the market by creating a false impression of

        brisk activity that artificially inflates the price of the stock.

**Dynkowski Engaged in Illegal Wash Trading**

56.     Dynkowski made a great deal of money, not by trading penny stocks, but by acting as a

        consultant for persons who had large blocks of stock they wished to sell.

57.     Dynkowski would be hired by a person with a large block of stock in order to create

        interest in the stock and to direct the timing of the sale of the stock.

58.     For his efforts, Dynkowski received between ten and fifty percent of the proceeds of the

        sale of the stock.

59.     Thus, the higher Dynkowski could inflate the price of the stock, the more money he

        would make.

60.     As shown through the specific stock deals detailed below, Dynkowski illegally inflated

        the price of stocks by engaging in fraudulent and manipulative trading practices.

**- The GH3 (GHTI) Deal**

61.     Matt Brown was interviewed by law enforcement on March 9, 2007. According to

        Brown, the $146,700 in cash that David Justin Woods was delivering to Dynkowski was

        Dynkowski's share of the proceeds of the sale of GH3 International ("GH3" or "GHTI")

        stock.

8

62. GH3's website states that the company sells an anti-aging cream that has been used by many famous dead people including John F. Kennedy, Charles de Gaulle, Mao Tse Tung, Leonid Brezhnev, Marilyn Monroe and Jimmy Stewart.

63. Also according to Matt Brown, sometime in October or November 2006, he and Dynkowski met with Richard "Rick" Bailey, one of the owners of GH3 International, to discuss a consulting arrangement.

64. Jacob "Jake" Canceli had a note to sell a block of GH3 shares.

65. Canceli is 48 years old and has a 2004 conviction from California for "preventing, dissuading witness with threats or force."

66. According to records found during a search of Brown's home, Canceli had 312 million shares of GH3 to sell.

67. Dynkowski's job as a consultant was to time the sale of Canceli's GH3 shares so as to bring in the most revenue for the participants.

68. Canceli gave Dynkowski authority to execute trades out of his, i.e. Canceli's, trading account.

69. For his role, Dynkowski was to receive 50% of the proceeds derived from the sale of the stock. Of that 50%, he had to give a share of the proceeds to various others who had some involvement in the deal, including Joseph "Joey" Mangiapane. Brown could not explain what Mangiapane had done to justify a cut of the deal.

70. Records found during the search of Dynkowski's home listed the shares he bought and sold on Canceli's behalf and listed the "cuts" that were to go to others.

71. Splitting the proceeds of stock sales with others is indicative of fraud, because legitimate

9

investors do not coordinate the purchase and sale of stock with others.

72.     Before Dynkowski started buying GH3 stock in early December 2006, shares of GH3
        were selling for approximately one half of a cent.

73.     Dynkowski began trading GHTI through his personal trading account and through a
        trading account he held in the name of Tetrix Financial.

74.     Specifically, between December 6 and 13, 2006, Dynkowski traded approximately
        54,000,000 shares of GH3 through his personal trading account and traded over
        2,000,000 shares of GH3 through his Tetrix Financial trading account.

75.     Dynkowski was the largest trader of GH3 during December 2006.

76.     In addition, during the same period, approximately 7,000,000 shares of GH3 were traded
        through Richard's trading account.

77.     During the same period, three known associates of Dynkowski's also purchased GH3
        stock.

78.     Within a week of Dynkowski commencing trading activity, the price of GH3 shares had
        roughly tripled to 1.35¢ per share.

79.     During this same period, Dynkowski began selling shares of GH3 stock out of Jake
        Canceli's trading accounts.

80.     Between December 6 and December 13, 2006, Dynkowski sold over 300 million shares
        from Canceli's accounts.

81.     In sum, Dynkowski, in an effort to artificially create demand in GH3 stock, traded in GH3
        under at least three different names.  This activity falsely gave the appearance of brisk
        trading by several different people and constitutes fraudulent and manipulative trading.

10

According to trading records, the sale of the Canceli shares netted over $730,000. While records show that Dynkowski lost approximately $2,400 on his personal trading (most likely because he was using his shares to prop up the market), after he paid everyone their "cuts", he made at least $146,000 from the sale of the Canceli shares. Thus, his profit from his illegal activity was at least $143,000.

## - The Playstar (PLCYF) Deal

82.    Upon information and belief, Dynkowski appeared to have the same type of consulting deal regarding the trading of stock in Playstar Corporation ("PLCYF" or "Playstar").

83.    According to its website, Playstar is an Antiguan domiciled company that "currently owns a subsidiary called Premier Mobile Technologies Inc. that operates and develops short code services in [sic] United States and Canada."

84.    Between October 19, 2006 and November 15, 2006, Dynkowski traded in Playstar stock as Tetrix Financial and for various clients. Specifically, during that time period, trading under a Charles Schwab account in the name of Tetrix Financial, Dynkowski made over 200 trades of PLCYF involving a total of over 1 million shares. On this personal trading, Dynkowski lost approximately $1,000. However, Dynkowski's records reveal that Dynkowski also sold 15,557,400 shares of PLCYF from "Gerard Damaro's" account and an additional 3,510,000 shares from "Client" accounts.

85.    By November 9, 2006, the price of PLCYF had increased to $0.145, an increase of 2800% compared to the stock's price on October 16, 2006 (when it was trading for one half of a cent). During the week of November 15, 2006, Damaro's account sold 3.5 million shares of PLYCF for a profit of over $400,000. According to Dynkowski's

11

records, "commissions" from the sale of PLCYF were $89,500. Ten percent of that amount went to a participant listed as "kid", while Dynkowski and Gerard Damaro each received $40,275.

86.     Thus, once again, in an effort to artificially create demand in PLCYF by giving the appearance of brisk trading by several people, Dynkowski appears to have traded in PLCYF under at least three different names. This fraudulent and manipulative trading netted Dynkowski a substantial profit.

## - The MGM Mineral Resources (MGMX) Deal

87.     According to Dynkowski's records, between October 2, 2006 and October 25, 2006, Dynkowski traded MGM Mineral Resources Inc. ("MGMX") stock, both through a personal account in his own name and through an account in the name Tetrix Financial. MGMX describes itself as a "promising company dedicated to the business of mining . . . [whose] key target projects are lands and mines throughout the Latin American countries."

88.     Using these two accounts, Dynkowski made 43 trades involving a total of 1,310,000 MGMX shares. He lost $364.72 on this personal trading.

89.     However, once again, at the same time he was trading MGMX through his own accounts, Dynkowski also was selling MGMX for others, and, once again, his records show that he made a profit from selling MGMX on behalf of others.

90.     According to records seized during the search of his residence, on November 8, 2006, Dynkowski sold 30,000,000 shares at .001795, thereby generating $53,850. The company received 30% of the proceeds, or $15,900, and Dynkowski and three others,

12

"Gerard, Dave, (and) Joel", split the remaining $37,000. Thus, Dynkowski received
$9,250.

91.    On November 21 and 22, 2006, Dynkowski sold an additional 30,000,000 MGMX shares
       for $38,050. Once again, the company received 30%, or $11,186, and Dynkowski,
       "Gerard, Dave, (and) Joel" split the remaining $26,103. Dynkowski received $6,523.

92.    As with GHTI and PLCYF, in an effort to artificially create demand in MGMX,
       Dynkowski traded in MGMX under at least three different names. This fraudulent and
       manipulative trading once again netted Dynkowski a profit.

## - The Asia Global (AAGH) Deal

93.    Based on both Dynkowski's own records which were found during the search of his home
       and on an interview with Matt Brown, your affiant knows that Dynkowski had a
       "consulting" deal involving the sale of stock in Asia Global Holdings Corporation ("Asia
       Global" or "AAGH").

94.    On its website, Asia Global states that it "owns and manages businesses participating in
       high growth economies. The company has a strong focus on acquiring and building
       companies in China and other emerging regions in Asia and worldwide."

95.    Between August 9, 2006, and the end of September 2006,  Dynkowski placed 1,294 buy
       orders for AAGH in four different accounts that he controlled under his name, under the
       name Tetrix Financial, and on behalf of Asia Global.

96.    By August 25, 2006, AAGH's price had risen to 41 cents, up from about 10 cents at the
       beginning of August.

97.    Between August 30 and September 5, 2006, Dynkowski sold over 7 million shares on

13

behalf of Asia Global, generating total proceeds of $1,331,118.

98.     Dynkowski's records show that he made $348,122.56 on the shares he sold for Asia
        Global.

99.     Thus, just as in the other deals discussed above, in an effort to artificially create demand
        in AAGH, Dynkowski traded in AAGH under several different names. This gave the
        appearance of brisk trading by different parties and artificially inflated the price of the
        stock. Once again, this fraudulent and manipulative trading netted Dynkowski a
        significant sum.

## - First Petroleum & Pipeline (FPPL)

100.    Between April 3, 2006, and May 2, 2006, Dynkowski, trading under an account in the
        name of Tetrix Financial and under an account in his own name, made 58 trades of First
        Petroleum & Pipeline Inc. ("FPPL") involving a total of 8,749,992 shares. This resulted
        in a profit of $3,018.99. It is not currently known whether Dynkowski also traded in
        FPPL on behalf of others.

101.    Public information documented on IHub's website provides a graph showing historical
        data including share prices and trading volume for FPPL. Based on this chart, when
        Dynkowski started trading, First Petroleum & Pipeline Inc. was selling for less than half a
        penny per share. By the time Dynkowski completed his trading on May 2, 2006, the
        share price had more than quadrupled to just over .021.

## The Ameritrade Complaint

102.    During 2005, the Denver office of the SEC had opened an investigation into the equities
        trading practices of Dynkowski and Richard based on a complaint filed by Ameritrade, a

14

stock brokerage firm.  According to Ameritrade, Dynkowski and Richard had several accounts with Freetrade, a division of Ameritrade and a self-directed, online brokerage firm.  Ameritrade terminated all accounts held by Dynkowski and Richard because Ameritrade suspected that the Dynkowski and Richard were engaging in an equities price-manipulation scheme commonly called "spoofing".

103.    Spoofing involves accumulating a substantial quantity of lightly-traded small-capitalization stocks, e.g., penny stocks.  The spoofer then places a small order to buy that same stock at a higher price than is currently being listed. This automatically boosts the selling price of the stock.  The spoofer almost instantaneously sells his large quantity of the stock at an artificially inflated price. Finally, the spoofer cancels his initial buy order (the buy order that caused the price to inflate).

104.    As a result of its investigation, the SEC determined that the Dynkowski and Richard had made at least  $20,000 by spoofing.

**Dynkowski's Employment History**

105.    Dynkowski's primary, if not sole, source of income is his stock trading activities.

106.    According to Delaware Division of Revenue records, in 2004, virtually all of Dynkowski's income came from capital gains.  His 2005 Delaware tax return shows that he earned income from both capital gains and from "consulting" through Tetrix Financial.

107.    In addition, Delaware Division of Revenue records show that, in 2005, Dynkowski's parents, Richard and Elisabeth, declared only $29,954 in adjusted gross income.

108.    Richard and Elizabeth's income is insufficient to support the purchase of the Lamborghini, Porsche and Lincoln, and cannot be the source of the Currency.

15

**Purchase of the Lamborghini, Porsche and Lincoln**

**- The Lincoln Truck**

109.    The sales contract for the Lincoln truck shows that it was purchased on March 7, 2005, for $47,536.

110.    The title for the Lincoln lists Richard as the owner.

111.    At the time of the purchase, the purchaser put down a deposit of $25,000 and took a loan for the remaining $22,536.

112.    Records and interviews show that the $25,000 deposit came in three different forms: the dealership received $2,500 in cash, $10,000 in the form of a check drawn on Dynkowski's Wachovia Bank account, and $12,500 in the form of a Commerce Bank official bank check.  The bank check does not list a remitter.

113.    Thus, Dynkowski is the only person known to have put money towards the deposit on the Lincoln.

114.    In addition, bank records show that, since the date of purchase, Dynkowski has been paying the loan on the Lincoln.

115.    Between March 28, 2005 and December 30, 2005, payments for the loan on the Lincoln were automatically debited from Dynkowski's account at Wachovia.

116.    Furthermore, between January 29, 2006 and April 18, 2006, Dynkowski paid the loan on the Lincoln by check from his Tetrix Financial account at Commerce.

117.    In sum, while the Lincoln was purchased in Richard's name, the following evidence points to the fact that Dynkowski actually owned the car.  First, Dynkowski paid the deposit on the car and was paying the loan.  Second, Dynkowski's girlfriend told law

enforcement that the Lincoln was Dynkowski's. Third, when interviewed by law enforcement, people for whom Richard did a remodeling job in October and November, 2006, stated that Richard drove to their home in a Toyota Camry, although they remembered that on a couple of occasions when he had to deliver a large amount of building supplies, Richard came in a truck. Finally, items found in the Lincoln during a search of the vehicle, such as receipts in Dynkowski's name, point to the fact that the truck was owned and primarily used by Dynkowski.

118. These facts show that Dynkowski purchased the Lincoln truck using his father as a nominee owner.

119. Persons engaged in fraud and money laundering use nominee owners for large purchases when they want to hide those purchases from law enforcement. The use of a nominee is an affirmative act which is indicative of a wilful intent to conceal or defraud.

120. As detailed above, the Lincoln was purchased during the period when Dynkowski was engaging in spoofing, and he was paying off the loan during a period when he was engaging in other fraudulent and manipulative trading practices.

**- The Porsche**

121. The sales contract for the Porsche shows that the car was purchased on May 3, 2006, and lists the cost of the car as $76,443.

122. At the time of purchase, the purchaser put down a deposit of $26,443 and received a loan for the remaining $50,000.

123. The title for the Porsche lists Richard as the owner of the vehicle.

124. The $26,443 deposit consisted of a $1,000 check card debit drawn on Dynkowski's

Commerce Bank account held in the name of Tetrix Financial, a $25,043 check drawn from the same account, and $400 cash.

125.    In addition, records for the Tetrix Financial bank account at Commerce Bank show that between June 11, 2006, and December 14, 2006, payments totaling $14,781.37 were made on the loan for the Porsche from Dynkowski's Tetrix Financial account.

126.    In sum, while the Porsche was purchased in Richard Dynkowski's name, the following evidence points to the fact that Dynkowski actually owned the car. First, Dynkowski paid the deposit on the car and was paying the loan. Second, Dynkowski's girlfriend told law enforcement that the Porsche was Dynkowski's. Finally, items found in the Porsche during a search of the vehicle, such as receipts in the name of Dynkowski's girlfriend and a rap music cd, point to the fact that the Porsche was owned and primarily used by Dynkowski.

127.    These facts show that Dynkowski purchased the Porsche using his father as a nominee owner.

128.    As discussed above, persons engaged in fraud and money laundering use nominee owners for large purchases when they want to hide those purchases from law enforcement. The use of a nominee is an affirmative act which is indicative of a wilful intent to conceal or defraud.

### - The Lamborghini

129.    The sales contract for the Lamborghini shows that the car was purchased on September 5, 2006, from a car dealership in Florida for $319,545.

130.    At the time of purchase, the purchaser put down $244,985 and took a loan from Chase

18

Auto Finance for $74,907.50.

131. The title for the Lamborghini lists Richard as the owner of the car.

132. During the search of the Dynkowski home, officers found a letter dated November 22, 2006, from Chase Auto Finance to Richard stating that the loan on the vehicle had been paid off and the lien satisfied.

133. The $244,985 deposit was paid over the course of several days through two different sources - Dynkowski's Commerce Bank account and an account of Market Solutions LLC.

134. On August 28, 2006, the dealership received an $85,000 check from an individual named "Gerard" written on the account of Market Solutions LLC.

135. On August 29, 2006, the car dealership received a $25,000 wire transfer from Dynkowski's Commerce Bank account.

136. On August 31, 2006, the car dealership received a $12,000 check written on the account of Market Solutions LLC.

137. On September 1, 2006, the dealership received an $88,000 wire transfer from Dynkowski's Commerce Bank account.

138. On September 5, 2006, the dealership received a third check, in the amount of $34,985, written on the account of Market Solutions LLC.

139. Gerard Damaro, a resident of Florida, is the President of Market Solutions Limited Inc.

140. Ledgers recovered during the search of Dynkowski's home show that in August 2006, Dynkowski received two separate payments from "Gerard." The first payment was for $85,000. The second was for $12,000. These match the amounts sent by "Gerard" and/or

19

by Market Solutions LLC to the car dealership in August 2006 for deposit on the
Lamborghini.

141.   The same ledger reveals that in September 2006, Dynkowski received a $35,000 payment
       from "Gerard". This amount coincides with the $34,985 sent by Market Solutions LLC
       on September 5, 2006, to the car dealership for deposit on the Lamborghini.

142.   As alleged above, Gerard Damaro was someone with and for whom Dynkowski engaged
       in illegal stock trading.

143.   A ledger recovered during the search of Dynkowski's residence states that in August
       2006, during the period when Dynkowski was involved in the Asia Global deal,
       Dynkowski received $25,185 from "Mak".

144.   Michael Mak is the CEO and Director of Asia Global Holdings Corporation.

145.   Asia Global has an office in Hong Kong.

146.   Commerce Bank records confirm that on August 28, 2006, $25,185 was wired from a
       bank in Hong Kong to Dynkowski's Tetrix Financial bank account.

147.   The next day, August 29, 2006, Dynkowski wire transferred $25,000 from his Commerce
       Bank account to the car dealership in Florida for deposit on the Lamborghini.

148.   In sum, while the Lamborghini was purchased in Richard's name, the following evidence
       points to the fact that Dynkowski actually owned the car. First, Dynkowski admitted that
       the car was his. Second, Dynkowski and/or others who owed him money paid the deposit
       on the car. Third, Dynkowski's girlfriend told law enforcement that the Lamborghini was
       Dynkowski's.

149.   As discussed above, persons engaged in fraud and money laundering use nominee owners

for large purchases when they want to hide those purchases from law enforcement. The

use of a nominee is an affirmative act which is indicative of a wilful intent to conceal or

defraud.

## -The Currency

150.   As stated previously, during the search of Dynkowski's residence, police found the

Currency in a lunch box under Dynkowski's bed.

151.   When asked about the Currency, which was made up of $100 and $50 bills, Dynkowski

falsely stated that he had withdrawn the money from his bank accounts via ATM

machines.

152.   As detailed above, Woods was paid $10,000 to deliver Dynkowski's "cut" of the GH3

deal. Dynkowski's cut from this one deal consisted of cash in an amount far greater than

the Currency.

153.   Upon information and belief, based on the Currency's concealment in the residence,

Dynkowski's false statement as to how he obtained the Currency, the substantial amount

of money Dynkowski earned from his illegal stock trading, the lack of evidence of

income derived from any legitimate source, and his parent's comparatively tiny income,

the Currency is derived from Dynkowski's illegal stock trading activities.

### COUNT I
### Proceeds of Conspiracy to Commit Wire Fraud

154.   Plaintiff incorporates by reference paragraphs 1 to 154 above.

155.   Upon information and belief, Dynkowski conducted his stock trading activity by

computer, and communicated with other persons participating in his activities by

computer.

156.    Dynkowski and others agreed to engage in fraudulent and manipulative trading practices
        to enhance the profits they could make on the sale of stock, including the GH3, Playstar,
        Asia Global, MGMX and FPPL deals, and further engaged in one or more of the overt
        acts described above.

157.    The fraudulent and manipulative trading activities engaged in by Dynkowski and others
        constitute a scheme or artifice to defraud within the meaning of 18 U.S.C. § 1343.

158.    The execution of stock trades via computer constituted the use of wire communications
        for the purpose of executing such scheme and artifice to defraud.

159.    The defendants *in rem*, and each of them, constitute, or are derived from, proceeds
        traceable to a conspiracy to violate 18 U.S.C. § 1343, and as such are subject to seizure
        and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. 2461(c).

## COUNT II
### (Property Involved in an Illegal Monetary Transaction)

160.    Plaintiff incorporates by reference paragraphs 1 to 159 above.

161.    Dynkowski did knowingly engage and attempt to engage in a monetary transaction, that
        is, the purchase of the Lincoln from a car dealership in Delaware which was then engaged
        in, and the activities of which affected, interstate commerce, using criminally derived
        property of a value greater than $10,000, such property having been derived from a
        specified unlawful activity, wire fraud, in violation of 18 U.S.C. §§ 1957 & 2.

162.    The Lincoln was involved in a transaction or attempted transaction in violation of 18
        U.S.C. § 1957, or is traceable to property involved in such a violation, and as such is

subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## COUNT III
### (Property Involved in an Illegal Monetary Transaction)

163.    Plaintiff incorporates by reference paragraphs 1 to 159 above.

164.    Dynkowski did knowingly engage and attempt to engage in a monetary transaction, that
        is, the purchase of the Porsche from a car dealership in Delaware which was then engaged
        in, and the activities of which affected, interstate commerce, using criminally derived
        property of a value greater than $10,000, such property having been derived from a
        specified unlawful activity, wire fraud, in violation of 18 U.S.C. §§ 1957 & 2.

165.    The Porsche was involved in a transaction or attempted transaction in violation of 18
        U.S.C. § 1957, or is traceable to property involved in such a violation, and as such is
        subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## COUNT IV
### (Property Involved in an Illegal Monetary Transaction)

166.    Plaintiff incorporates by reference paragraphs 1 to 159 above.

167.    Dynkowski did knowingly engage and attempt to engage in a monetary transaction, that
        is, the purchase of the Lamborghini from a car dealership in Florida which was then
        engaged in, and the activities of which affected, interstate commerce, using criminally
        derived property of a value greater than $10,000, such property having been derived from
        a specified unlawful activity, wire fraud, in violation of 18 U.S.C. §§ 1957 & 2.

168.    The Lamborghini was involved in a transaction or attempted transaction in violation of 18
        U.S.C. § 1957, or is traceable to property involved in such a violation, and as such is
        subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

23

WHEREFORE, the United States prays that:

a.     due process issue to enforce the forfeiture of the defendants *in rem*;

b.     due notice be given to all interested parties to appear and show cause why forfeiture

should not be decreed;

c.     judgment be entered declaring that the defendants *in rem* are forfeited to the United States

of America for disposition according to law;

d.     the United States be awarded all of its costs, expenses, and disbursements in this action;

and

e.     the United States be awarded such other and further relief as this Court may deem just

and proper.

> COLM F. CONNOLLY
> United States Attorney
>
> DAVID C. WEISS
> First Assistant United States Attorney
> Chief, Civil Division
>
> By:
>
> Douglas E. McCann (#3852)
> Assistant United States Attorney
> 107 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, Delaware  19899-2046
> (302) 573-6277 x168
> douglas.mccann@usdoj.gov
>
> Attorneys for Plaintiff
> United States of America

DATED: August 14, 2007

24

## **VERIFICATION**

I, WILLIAM SHIELDS, declare:

1.     I am a Special Agent for Immigration and Customs Enforcement, United States Department of Homeland Security

2.     I have read the foregoing Verified Complaint *in rem* and know its contents.

3.     The information contained in the complaint has been furnished from official government sources and, based on information and belief, the allegations contained in the Complaint for Forfeiture are true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 14, 2007

_____

WILLIAM SHIELDS

25

**07 ‑ 4 9 8 ‑**

○JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America

## DEFENDANTS

ONE 2005 LAMBORGHINI; et al

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Douglas E. McCann
Assistant United States Attorney
1007 Orange Street, Suite 700
PO Box 2046
Wilmington, Delaware 19899-2046  tel. 302-573-6277

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

[x] 1   U.S. Government Plaintiff

[ ] 3   Federal Question (U.S. Government Not a Party)

[ ] 2   U.S. Government Defendant

[ ] 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ]1 | [ ]1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ]4 |
| Citizen of Another State | [ ] 2 | [ ]2 | Incorporated *and* Principal of Business In Another State | [ ] 5 | [ ]5 |
| Citizen or Subject of a Foreign Country | [ ]3 | [ ]3 | Foreign Nation | [ ] 6 | [ ]6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury | **PERSONAL INJURY**<br>[ ] 362 Personal Injury— Med. Malpractice<br>[ ] 365 Personal Injury — Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 610 Agriculture<br>[ ] 620 Other Food & Drug<br>[ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 630 Liquor Laws<br>[ ] 640 R.R. & Truck<br>[ ] 650 Airline Regs.<br>[ ] 660 Occupational Safety/Health<br>[x] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 840 Trademark | [ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce/ICC Rates/etc.<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 810 Selective Service<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 875 Customer Challenge 12 USC 3410<br>[ ] 891 Agricultural Acts<br>[ ] 892 Economic Stabilization Act<br>[ ] 893 Environmental Matters<br>[ ] 894 Energy Allocation Act<br>[ ] 895 Freedom of Information Act<br>[ ] 900 Appeal of Fee Determination Under Equal Access to Justice<br>[ ] 950 Constitutionality of State Statutes<br>[ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | | |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 444 Welfare<br>[ ] 440 Other Civil Rights | **PRISONER PETITIONS**<br>[ ] 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Mgmt. Relations<br>[ ] 730 Labor/Mgmt.Reporting & Disclosure Act<br>[ ] 740 Railway Labor Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Empl. Ret. Inc. Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

[x] 1 Original Proceeding   [ ] 2 Removed from State Court   [ ] 3 Remanded from Appellate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from another dist'ict (specify)   [ ] 6 Multidistrict Litigation   [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 USC 981(a)(1)(A), 981 (a)(1)(C) and 28 U.S.C. 2461 (c) Civil Forfeiture of proceeds of conspiracy to commit wire fraud.

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE  8/14/07   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____